UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARY LEE BARNETT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:12CV00373CDP |
| | ) | |
| MARC WASEM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## TRIAL BRIEF

### Statement of Facts

On June 25, 2010, two St. Louis Metropolitan Police officers, Detective Wasem and Detective Busso, pulled up to 3851 Sherman Place because they suspected that drug transactions were occurring at that location. There were many people in, at, and around 3851 Sherman Place. The officers jumped out of their vehicle and Detective Wasem attempted to arrest Normane Bennett. Bennett fled a short distance to a cut-through between Bennett's mother's home and an abandoned house next door. A struggle ensued between the two. Various witnesses were present, including members of Bennett's family. The officers allege that Bennett's mother and sister interfered with the arrest allowing Bennett to escape the grasp of Wasem.

Once Bennett was free, he ran up the stairs to the porch of his mother's home with Wasem following. Bennett then jumped off the side of the porch and continued running through a vacant lot and down the alley between Sherman Place and Lee Avenue. While Bennett was unarmed, Wasem shot at Bennett at least seven times, striking him five times. Wasem alleges that Bennett pulled a revolver and pointed it at him in a threatening manner, but no other witnesses, even

1

those standing very close to Bennett and Wasem saw Bennett with a gun, nor had anyone seen Bennett with a gun at any time that day.

At the time of this incident, the St. Louis Metropolitan Police Board had the power and was charged with the duty to control and supervise its department members, as they had the authority to investigate, discipline, and hire and fire whomever they wished within the Department. RSMo 84.170 (2)-(3).

## Legal and Factual Issues and Authorities

1. Normane Bennett did not have a gun at the time that Wasem shot and killed him.

Wasem claims that Bennett had a gun throughout the struggle in the cut-through, the chase to the porch, the jump over the side of the porch, and the chase to the alley before he pulled the gun on Wasem and that only at that time did Wasem finally see the gun. Wasem further claims that he yelled "Drop the gun!" before shooting Bennett. However, there were eyewitnesses that were following behind them that did not see Bennett pull a gun, nor did they hear Wasem yell, "Drop the gun."

2. Wasem, in his capacity as a police officer for the St. Louis Metropolitan Police Department, violated Bennett's Fourth Amendment rights when he shot and killed him even though Bennett posed a threat to no one.

Wasem violated Bennett's Fourth Amendment rights against unconstitutional searches and seizures when he seized Bennett by shooting and killing him. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Wasem violated Bennett's Fourth Amendment rights. The Fourth Amendment protects citizens from unreasonable search and seizure. "The 'reasonableness' of a particular seizure

depends not only on when it is made, but also on how it is carried out." *Graham v. Connor*, 490 U.S. 386, 388 (1989) (internal citations omitted). "Defendants will not be immune, however, 'if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action.'" *Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2003) (citing *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir. 2001); quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In this case, Wasem shot Bennett when Bennett had no gun and was posing no threat to law enforcement, as several witnesses will testify. Furthermore, Kamal Sabharwal, the medical examiner, will testify that two of the bullets were found lodged in Bennett underneath him. These bullets were positioned in such a manner indicating that the pavement prevented them from going any further, proving that Wasem continued shooting Bennett, even when Bennett was lying on the pavement. In *Nance v. Sammis*, the Eighth Circuit Court of Appeals stated, "a suspect cannot be apprehended by use of deadly force unless that individual poses a threat of serious physical harm." 586 F.3d 604, 611 (8th Cir. 2009).

Wasem, as a St. Louis Metropolitan police officer is a state actor. He was on-duty working in his capacity as a police officer when he shot and killed Bennett, as Wasem himself will testify. Because Wasem, acting under the color of state law, violated Bennett's Fourth Amendment rights, he violated 42 U.S.C. § 1983.

3. The Board of Police Commissioners for the St. Louis Metropolitan Police Department knew of a pattern of misconduct within the Department, but did nothing to rectify the actions of the officers, thus creating a municipal custom and tacitly approving the misconduct of the officers.

In *Monell v. New York City Department of Social Services*, the United States Supreme Court found that "local governments…may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the

body's official decisionmaking channels." 436 U.S. 658, 691 (1978). Liability based on a governmental body's "custom" requires:

"(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e. [proof] that the custom was the moving force behind the constitutional violation."

*Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 645 (8th Cir. 1990)).

    a. There is a custom of misconduct within the Department, and furthermore, Wasem himself has engaged in a pattern of misconduct.

First, there must be a "continuing, widespread, persistent pattern of unconstitutional misconduct" by those within the Department. *Id*. In this case, there is a pattern of misconduct within the St. Louis City Police Department and also a pattern of misconduct exemplified by Wasem.

        i. The Department as a whole has a pattern of misconduct, as evidenced by the statistics provided by Internal Affairs to the Board.

From 2002 to 2007, no violations of the use of force policy were reported by Internal Affairs to the Board because Internal Affairs characterized reported violations under various other categories to protect the Department from liability. During that same period of time, there were 235 allegations of physical abuse. However, only 5 of these allegations were sustained, meaning that Internal Affairs decided that "more likely than not that [the officer] caused the physical abuse." Deposition of John Hayden, p. 86. This same low rate of sustained allegations was

4

pointed out by Judge Webber in *Rohrbough v. Hall* decision concerning the years 1996-2001. 2008 WL 4722742 at 3 (E.D. Mo. 2008). In the two years including and after the *Rohrbough* decision, 2008 and 2009, only two allegations out of 38 were sustained. From 2010, when this incident occurred, to 2012, the last complete year of statistics available, only two of 85 complaints have been sustained. These low rates of sustaining complaints indicate that the Department is more concerned about protecting itself from liability than protecting the rights of citizens. Each year the Board receives these statistics as required by the Police Manual. Police Manual Section 7.024. Therefore, the Board has knowledge of the deceptive categorization of citizen complaints by Internal Affairs and the low rates of sustaining citizen complaints of physical abuse.

Despite the fact that the Board knew about the unconstitutional misconduct of officers, the Board did not engage in its own independent investigation. In *Mettler v. Whitledge*, the Eighth Circuit stated, "this Court has held municipalities liable under *Monell* when the plaintiffs have produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct." 165 F.3d 1197 (8th Cir. 1999).

The statistics provided to the Board indicate misconduct within Internal Affairs and the Department.

> ii. Wasem has been involved in six shots fired incidents and has punched a citizen in the face while off-duty outside a bar, thus proving that he himself has been engaged in a pattern of misconduct.

Wasem has personally been engaged in misconduct while on the force. He has been involved in six shots fired incidents, four prior to the incident where he killed Bennett. On April 10, 2008, more than two years before Bennett was killed, Carlos Perry was shot in the arm by Wasem on April 10, 2008. State of Missouri v. Carlos Perry Transcript, p. 454. Perry stated that he did not

have a gun that night, even though Wasem claimed that he did. *Id*. at 36-37, 215.[1] Because of the similarity of the cases, the Board had notice of Wasem's unconstitutional conduct as a police officer.

Prior to the Carlos Perry incident, Wasem was involved in an incident with a citizen named David Feinberg while he was off-duty. On November 3, 2008, Wasem punched Feinberg in the face outside The Trophy Room, a bar where they had both been patrons that night. This bar is located within the City of St. Louis, and that night, Wasem was with several City of St. Louis police officers. This establishment is often frequented by City of St. Louis police officers. Feinberg reported this incident to Internal Affairs. While Internal Affairs stated that they investigated the report, Wasem was only given a one-day suspension for failing to write a report.

Based on these incidents, the Board should have known that Wasem engaged in a pattern of misconduct and should have taken actions to prevent further problems.

> b. The Board showed their tacit indifference to the pattern of misconduct within the Department by failing to train, discipline, and supervise the officers.

The Board failed to provide appropriate training. David Klinger wrote a report to the Board entitled "Independent Review of Officer Involved Shootings" (the "Klinger report"). This report was submitted in March of 2009, more than a year before Bennett's death. In that report, Klinger states, "That many of the officers I spoke with did not have a clear understanding of SLMPD policy provisions governing the use of deadly force indicates that there is some problem(s) with the manner in which SLMPD conveys the contents of its deadly force policy." Klinger Report, p. 26.

---

[1] Facts about this incident will be presented by utilizing portions of the transcript of Carlos Perry's criminal trial because Perry has made himself unavailable by refusing to testify. Although Perry was first willing to help in this matter, he is now unwilling to do so. His attorney is Eric Selig, who has indicated to counsel that under no circumstances will Carlos Perry testify.

Although the Klinger Report was available to the Board and presumably read by the Board over a year before Bennett was shot and killed, the organization failed to make appropriate changes to protocol regarding the investigation of shots fired incidents, thus the same procedures that were criticized by Klinger were used to investigate Wasem's killing of Bennett. Klinger specifically noted that the Department should include diagrams when it investigates shots fired incidents, it should audio or video record all witness statements, particularly those of the officers themselves. Klinger Report, p. 39-43. Klinger also stated that 9-1-1 tapes should be transcribed and point-by-point summaries should be created of the incidents. Klinger Report p. 43-44. Klinger specifically criticized the Department's policies, stating, "the present review process includes no assessment of the officer's actions in previous shooting incidents to identify any sorts of patterns that might be suggestive of any sort of problem." Klinger Report p. 47. He concluded, "there is substantial room for the SLMPD to improve several components of its current approach to training regarding field tactics and the use of deadly force, how the department investigates incidents in which officers discharge their weapons, and how the department conducts administrative reviews of shooting incidents." Klinger Report p. 48.

Based on the fact that the Board did not utilize any training programs or discipline after Wasem's actions, the Board has shown its indifference to the use of excessive force, even deadly force by failing to train and supervise officers. The Board has in put in place Performance Evaluation Enhancement Program (PEEP) which utilizes RAMS to flag employees that have been involved in (1) "Any combination of resisting arrests or use of force incidents totaling three or more in any three month period" or (2) "within a one year period…three or more Use of Force incidents." Special Order 4-04. The Internal Affairs Department, Human Resources, and

Wasem will testify that despite the fact that Wasem should have been flagged by these programs, he never was required to complete any additional training based on his previous misconduct.

Internal Affairs is also utilized in supervising the Department. However, as previously discussed, Internal Affairs categorized citizen complaints of police misconduct in a manner that allowed the Department to avoid liability. Because officers knew that Internal Affairs would cover up their misconduct, the officers were not held accountable for their actions and misconduct festered within the Department.

Furthermore, the Board must approve all shots-fired incidents as part of their role of supervising the Department. In doing so, they may review officers' prior conduct. Despite the fact that Wasem had previously been accused of shooting another man and planting a gun on him and Wasem had been involved in several other shots-fired incidents and uses of force, the Board approved the shots-fired incident in this case, thus further proving their indifference to Wasem's use of excessive force and violation of Bennett's rights.

Finally, the Board failed to discipline officers. Wasem was never disciplined for killing Bennett. He was never disciplined for shooting Perry. He was only given a one-day suspension when he punched Feinberg outside a bar. The Board has failed to discipline Wasem for engaging in the use of excessive force, thus tacitly approving of Wasem's actions.

   c. The municipal custom of the Department created by the Board's indifference and tacit authorization of misconduct caused Bennett's death.

The third element required to prove a municipal custom is "Th[e] plaintiff[‘s] injur[y] by acts pursuant to the governmental entity's custom, i.e. [proof] that the custom was the moving force behind the constitutional violation." *Ware*, 150 F.3d at 880 (quoting *Jane Doe A*, 901 F.2d at 645). The Eighth Circuit has determined, "Where it becomes clear that a police force needs close and continuing supervision because of a known pattern of misconduct, and the municipality

fails to provide such supervision, 'the inevitable result' is a continuation of the misconduct." *Harris v. City of Pagedale*, 821 F.2d 499, 508 (8th Cir. 1987). The Board had notice of the need to supervise the Department and Wasem based on the statistics provided to the Board, the Klinger report, Judge Webber's opinion in *Rohrbough*, the Feinberg assault, and the Perry shots fired incident. Despite the knowledge that it needed to change its policies, the Board failed to train, supervise, and control and discipline the Department's officers. As such, the Board's failures were the moving cause in Bennett's death.

4. Wasem is liable for battery against Bennett because he shot and killed Bennett, and his actions caused Bennett bodily harm and death.

Wasem will testify that he intentionally shot and killed Bennett. In doing so, Wasem utilized excessive force. Wasem's actions caused Bennett bodily harm and death, and therefore, Wasem is liable for battery against Bennett.

5. Conclusion

Based on the evidence and arguments above, the Plaintiffs will prove that Wasem is liable to Mary Barnett and Norman Bennett for their son's death based on 42 U.S.C. § 1983. Plaintiffs will further prove that the Board is liable under 42 U.S.C. § 1983 based on the municipal custom that it created in the St. Louis Metropolitan Police Department. Finally, Plaintiffs will show that Wasem is liable for battery under state law against Bennett.

Respectfully submitted this
10th day of September, 2013.
/s/ Craig Kessler
Craig L. Kessler
Missouri Bar #40206
Attorney for the Plaintiff
103 S. Meramec
Clayton, MO 63105
(314) 725-0700
(314) 725-4603 FAX

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 10th day of September, 2013, the foregoing sent via electronic communication to the Missouri Attorney General's Office.

Dana Walker Tucker
Denise G. McElvein